Prime Choice v. Schneider Logistics. Mr. Condon. May it please the courts, my name is Jacques Condon on behalf of the appellant to Prime Choice Services Inc. and I'm going to talk to you today about a procedure contract case that's before you that's interesting from the perspective it involved two trials, one summary judgment decision, and two judgments, both of which were amended twice. And while that procedure is interesting, what I'm going to focus primarily today of the issues in the case is the court's order to set aside the first verdict and order a second trial solely limited to damages. While I believe all of the issues are related to one another, I'm going to focus on that first issue. I'm going to focus on that first issue, the order of a new trial. This is a trial that took three days, five witnesses. The trial issues that were posed to the jury were one of repudiation and second, damages. The backtrack to the story is at summary judgment, the court found in favor of my client at summary judgment to the tune of $286,000, saying I was entitled to that amount. The issue at trial was left to an offset damage claim by Schneider. The issues posed by the court were one of repudiation and two of damages. In this case, the jury came back and said yes, there was a repudiation, but the damages were zero. There were no damages. The trial court, in its post-judgment decision, in a somewhat unique decision, said damages could only be determined one way, and in that way, they cannot be zero. And that finds on page four of the decision, it's in the appendix page nine, the June 6, 2006 decision says in this case, that meant the cost of calculating damages and it explained how that was supposed to be determined. That is not the law when it comes to calculating damages. What is the law when it comes to calculating damages? This is a Wisconsin case, here on diversity jurisdiction. Were they instructed how to calculate the damages? Yes, they were, but they weren't told it has to be a certain way. Unlike the court's decision which says you have to calculate it, it is, in this case, that meant calculating, that's the words of the district court. Here's what the jury was instructed. The jury was told Schneider may recover, not shall recover, damages. What the attorneys asked for in their arguments is not the measure of damages. If you find in favor of the whatever, you may award damages. Here's what they were told. This comes from Wisconsin Civil Jury Instructions 3710, page 33 of my brief, record 73, which is the jury instructions, page 11. The instruction was in determining the damages, if any, you allow an amount that will reasonably compensate the injured person. In determining the damages, if any. They were instructed you may find no damages. There may not be damages in this case. That's what they were instructed. And by the way, that's also what they were instructed in trial number two, but trial number two, we didn't get to put on our damage case against that. That's a whole different issue. So, and the basis that the first decision was set aside was what? The judge said that the jury's finding of zero damages was against the weighting methods. Although they were instructed otherwise. They were instructed otherwise. They were instructed on what the law in Wisconsin is on that very point. They were also instructed on the same, on page nine of the jury instructions. This is once again record 73, page nine of the jury instructions. They were told, they were told at the first trial, my client was owed $289,000 for work performed. That was stipulated to by myself and opposing counsel, by Schneider. In that stipulation, this is a record 68 of that stipulation. Prime choice is, so the stipulation says, Schneider stipulates and agrees that prime choice is owed the amount it demands in the complaint, $289,095.95. Was that due the next, at that point? What's that? That was due at that point? That was due at that point subject to an offset. And the problem was that they were not paying on time? That's right. Okay. That's right. But otherwise that, there's not any question that, that prime was owed that. I'm sorry. Prime choice. Prime choice had done a certain amount of work. No question it was stipulated to. And was owed. And that, that's okay. Yep. Well, I have two suggestions for you. The first is never mention the Wizard of Oz in a brief again, would you please? I will, Your Honor. That's extremely unprofessional and nonsense. My second suggestion, why don't you and Schneider arbitrate this dispute? This is something, this is not something for a jury. The jury would be totally confused about this. Well. Arbitration, you find someone who knows, you know, knows the industry and will figure out what, if any, damages, you know, Schneider is entitled to. There were those discussions, Judge. Pardon? There were those, we've, we had many discussions on this case. In terms of settlement, it just never resolved. Well, in effect, that's what the judge did. He took it back and, and arbitrated it, as I call it. Well, I looked at trial number two. So, we have the first trial. We, we have stipulations say you're owed this amount of money and that's told the jury. The jury is told what damages do they have, if any. The jury is also told, do not consider the fact that money is owed prime choice. They're told that in the jury instructions. You must not consider the amount of money Schneider has already been found to owe prime choice for unpaid invoices in determining Schneider's damages, if any. Is that just part of the standard instruction, that if any? It's comes from Wisconsin law. Yeah, well I mean. Wisconsin standard jury instructions. They say that all the time, right? They, they do. And, and that's because of the nature of damages. Yeah. Because of the nature of damages. If any. That's the jury always has that caveat, whatever you want to call it. Right, and the issue here. And that's what you're relying on. Absolutely, that's what I'm relying on. Because, I mean, the facts of this case is my client wasn't paid. And, I mean, that is the fact by which all of the facts, I believe, are judged in this case, is they were not paid. They were paid every week. There were all of these other issues going on. Jobs were being taken away. Jobs were given to them, taken away. They were, they had discussions about bonuses. They had discussions that, you know, why are you taking jobs away? They had these, what did they negotiate at the time in this, this contract? You had back and forth, all of this back and forth. But my client was paid until Tuesday, August 27th. Was paid every Tuesday until then. It sends, what does it do when it is not paid? It sends, it first calls Schneider and leaves a message. And then sends them a letter saying, hey, you owe me today $86,000. They don't get paid $86,000. Was there any communication between the two parties? Absolutely, yes. I mean, after the, that you said after they didn't get paid. What, after that? There were, there were the letters. There, there was a phone call made. There was the letter. There were other discussions between people at Schneider and my client. Including somebody at Schneider who says, what's it going to take for you guys to stay? And, and they're talking about bonuses. Because at that time, in the contract, we were assigned three jobs. Two of those jobs were taken away. We were only working one at the time. What's it going to take for you guys to stay? Two hundred. Who said that? One of the Schneider's representatives, Mr. Critchfield. Oh. Who in this case, and one of the problems with the court's decision is, you may see credibility finding on Critchfield. Not with analysis, but with just saying, Critchfield's credibility was not reasonably cast in doubt. Well, in my briefs, not only here, but in my post-trial briefs and at trial, we argued about Critchfield's credibility. Here's the guy who negotiates the contract, assigns jobs to my client, when my client knows my client isn't paid, and is discussing, what's it going to take for you guys to stay? In our letter of March 20, or August 27th, we said, we're owed $86,000 today. They didn't get paid. The same letter says, we owe $86,000, if we don't get paid, we're going to pull our guys. Who said that? Our, my client did. Yeah, okay. We're going to pull our guys. My client thought he was pulling on the fifth day. Is it five day right to cure? He thought he was pulling on the fifth day. Pulled him on what he counted as the fifth day. Pulled on his employees. Still didn't get paid then. Still didn't get paid in that five days in the meantime. Pulled his employees, and has never gotten paid. There was a small payment made three days later of half of the amount, but it was not the amount that we were owed. And by that time, more was owed. And by that time, Schneider had moved on. They hired away all our employees that we had working on the facility. They hired us in- So Schneider is a bigger company than Prime, isn't it? It is. Much bigger? It is. How much bigger? Oh, they're- They're huge. Council would be able to speak to that more. I mean, they're multi-millions. I mean, they're Green Bay based trucking company. Now, you presumably were happy with the first verdict. So did you defend that before the judge? Did you say this first verdict is fine? I did. I did. Could you have appealed it? I actually attempted to appeal. Under the law, when the court orders a new trial, it vacated the judgment. There was no final judgment from which I can appeal. I attempted to judge because I did not want to have a second trial on this very issue. And I filed my appeal. Was actually doing a amended docketing statement on this issue. Came across law that said, you're out of luck. You got to go back and do it again. And Schneider caught the same thing. They filed a suggestion. We talked about it. I dismissed the appeal. Does that mean there are no controls on a district judge who decides he doesn't like the first verdict, maybe he doesn't like the second, third, fourth, and tenth verdicts? He can keep dismissing the verdicts? There are supposed to be controls. There are supposed to be controls, and there actually are controls. And the problem was, they weren't followed here. What would it be? When it comes to a Rule 59 motion, it says there's only three ways or three circumstances that are proper to order a new trial. Now, these factors aren't in the court's decision. But those factors are, one, does the record show that jury's verdict resulted in a miscarriage of justice? Two, does the verdict on the record cry out to be overturned? Or three, does it shock the conscience? First two aren't in there. The first one, miscarriage of justice, there is a case site that lists miscarriage of justice, but that's not the court's ultimate decision. The court's ultimate decision is it's against the weight. And if you look at all of these cases, MedCon, Latino, Mejia, all of these cases I've cited, they don't talk about just against the weight. They talk about manifest weight. They talk about things more than just, I disagree with the decision. Because what is the district court supposed to do? It's supposed to give deference to the jury's finding. And that's the problem that I have here. Because in the court's decision, it takes, we talked about Mr. Critchfield. The court's conclusion on Mr. Critchfield was his credibility was not reasonably cast in doubt. Latino says, that's a province of the jury. That is absolute a province of the jury. Why are you even going into that? Latino also says, you're stuck with the record before you. So what's the court do? It says, you know I talked about how they took away cases. They took away some jobs, and we had only been working one job at the time. Court says, that's immaterial. It only matters whether they paid more once prime choice left. No, no. It can't be immaterial when it comes to those things. Was the jury's decision conflicting? It found that crime owed money or something? Or I always say, they found liability? They found repudiation, yes. But yet, zero damages. That's sort of internally inconsistent, isn't it? It's not because of the facts. One, we weren't paid, number one. Number two, think about this. Could not Schneider have mitigated, and mitigation was an issue in this case, all of its damages by paying my clients? I don't think I'd be standing here if they paid my clients. That one fact alone, to me, if they pay me, I'm not here. If they pay me, they have mitigated their damages. So based on that, I would ask that this court reverse, or vacate that decision, remand to reinstate the first verdict. Thank you. OK, thank you very much, Mr. Connell. Mr. Smyth? Good morning. May it please the court. Jonathan Smyth on behalf of the Appellee Schneider. The district court did not abuse its discretion. I don't see anything wrong with the first verdict. Your Honor, you mentioned the controls. What controls are there? There are controls, and it's that the court find that. I don't know what you mean by controls. I don't see anything wrong with the first verdict. So yeah, prime choice services repudiated the services contract. That was bad. So the jury says, yes, that was a repudiation. And then they say, what amount of money will fairly compensate Schneider? And he says, zero. Well, Schneider's a big company. It's rich, and so on. The jury may have felt, OK, prime shouldn't have done that. And it did cost Schneider something, but it's no big deal, because Schneider's a big company. That's the sort of thing juries do, right? Your Honor, juries are presumed to follow the instructions provided to them, and in this case, the damage instruction specified. That's not true. They need to. You don't set aside a jury verdict just because the jurors didn't follow instructions. The judge doesn't hear a broadcast of what the jury discusses in their deliberations. No one knows whether the juries are actually following what the judge said or making up their own conclusions. In any event, Your Honor, though, the district judge does not listen to the jury deliberations. That is correct, Your Honor. Those deliberations are sacrosanct. So we don't know what kind of crazy stuff the jurors are doing. But in this case, if all they were thinking was, yeah, Prime Choice should have done that, but on the other hand, we don't have to give Schneider loads of money, because Schneider is rich and Prime is not. Isn't that the sort of thing juries do? It's my position that isn't a proper finding of damages in this case. Yes, they do a lot of things, which if you had a recording of the jury deliberations, you would realize they weren't really following direction. They didn't understand them. Or they get in a hurry. They want to end. How long were these jury deliberations? Your Honor, it was a three-day trial with just over four hours of deliberations at the first trial, at least. How many hours? Just over four. So the jury certainly can deliberate, and it does so in secrecy. But the district judge, as this court has acknowledged in the case of McLean, is uniquely positioned as a presiding judge. No, he's not. He's very poorly positioned, because he didn't hear the deliberations. You heard the evidence, though, Your Honor. Yeah, but he doesn't make the decision. It's not a bench trial. The jury makes the decision. The jury deliberates. We don't know what the jurors say in their deliberations. Sometimes we find out, and it's often strange stuff. But they were talking about. That may be the case, Your Honor. But nevertheless. Maybe the rich guy loses. Right. That may be that juries take into account inappropriate considerations outside of the scope of what's been instructed in the evidence. I nevertheless have every confidence in our system of civil juries. But we do have Rule 59A for a reason, and that does provide the district court judge the authority to look at the evidence presented. And as this court said, again, in McLean, that it must give the benefit of every doubt to the trial judge in making that assessment. The trial judge is the one who is there. In the case of Mejia, the court said, the judge is in the best position to evaluate the evidence and determine whether the verdict was against the manifest weight. So what is Rule 59?  Is this the civil rules? The civil rules, yes, Your Honor. Provides for the grant of a new trial by the district court judge. I'm going to learn something. Did he set out what his reason was? Yes, Judge. It's set out in detail in his decision of June 6 of 2016, granting the new trial after the first trial. He specifically found that there was no evidence that Schneider's damages were zero. That is, the evidence at trial indicated Schneider had a certain amount of costs and that these costs exceeded the contract rate. This is a contract case. The obligations of the parties are set forth in the contract itself. And those obligations included Prime Choice working as directed by Schneider. When Prime Choice repudiated the agreement on August 31 of 2013, Schneider then, with merchandise, a testimony before the jury, was that it had merchandise waiting on the docks to be shipped to its customers and had no alternative to find the claims. So I'm looking at Rule 59 for the first time in my life. And I say, the court may on motion grant a new trial on all or some of the issues, et cetera, after a jury trial for any reason for which a new trial is heretofore been granted in an action of law in federal court. That doesn't say anything. Yeah, it does say that. Doesn't say anything, because it doesn't tell you what reasons have heretofore been grounds for a new trial. This court is recognizing cases like McLean, though, that a decision, a verdict against the weight is one such reason under Rule 59. That can't be true, because the judge doesn't know. If that were true, the judge would decide the case without sending it to a jury. What's the purpose of a jury if the judge is going to replace the verdict if he disagrees with it? Again, the presiding judge acts as. And it's very rare that judges do this. It is rare, Your Honor. And this court has observed that. That's not because juries are considered infallible. Because we have a system, questionable, in which juries are given decisional authority. And the judge isn't allowed to ignore that unless there's something really serious. And there was something really serious. What was serious here? We had evidence, which was uncontroverted, that Schneider had damages of a certain amount, that even under any theory. That's true. But the jury may have felt that because Schneider is such a big company and Prime is so small, it's enough that the jury has held that Schneider was a victim of improper conduct of Prime. But it may have felt the actual damage to a company as large as Schneider by this little pest is negligible. Well, it was. Well, you weren't exactly innocent because you didn't pay him. Judge Keeney, there was a history here between the parties. And the evidence was fully presented at the first trial to show that Prime Choice maybe struck a bargain that they didn't want to live with. That it wasn't profitable as they had hoped. They, in fact, maybe were losing money at various instances. And were seeking a way out of the agreement. They had, at various points in time, tried that. And although they never objected to Schneider's payment history, which the record shows was consistently beyond the 30-day term by three or more days, suddenly, on August 27th, we received this written notice stating this new alleged breach for failure to pay. When were you going to pay him? The evidence before the first jury was that upon receipt of that, Schneider responded saying that the invoices will be remitted, are being remitted, I think was the language of the correspondence. And put in place a mechanism to do that. Did the jury have this evidence? The jury had this evidence concerning the correspondence between parties. The first jury did, at least. Well, I'm talking about the second jury. The second jury did not have the evidence of the correspondence prior to the breach, the repudiation. Because upon a repudiation, it is treated as a total breach from that point forward. The obligations of the parties are defined by the contract itself. There was a no modification provision in the contract. So that is set forth in the contract, which was before the second jury. So we can understand what the nature of the obligations were for prime choice. It was not to decide the issue of liability or repudiation. Why are disputes of this sort settled by arbitration? As a jury, a jury isn't going to understand this stuff. Judge Posner. This explains the first verdict. I noted your Confused by this. There was a contraction. Look, you have two arguments in collision with each other. One, you think juries, when they're on your side, are, you know, great. And the other is that, well, if the judge doesn't like what the jury did, then the jury is thrown out. We got it right. It's a very clumsy way to deal with a complicated commercial issue, have jurors, especially when you don't buy their verdict. The contract between the parties does set forth that any dispute would be resolved by a court of general jurisdiction in Brown County, Wisconsin. That probably explains the choice of forum in this case. But the system we have is the civil jury system. That is one system we have. We have a lot of other systems. One of them is arbitration. And you'd think, now, arbitration is problematic when you have, you know, a little person, a consumer or something, forced to arbitrate with a big company. And of course, Prime is much smaller than Schneider, but still, it's a company. It's not just a hapless consumer. So you'd think, you know, you have an arbitrator, someone who knows about this industry, and he would resolve it. And he wouldn't have a judge involved and wouldn't have jurors. This is not a comfortable case for jurors. Well, what was the background of these jurors, anyway? The background of the jurors, beyond the fact that they were all residents of the counties which comprise the Green Bay Division of the Eastern District of Wisconsin, I don't, you know. Were they business people? As I recall, the panel had people of varying backgrounds and people who had worked for varying businesses. But as I stand here, I have a question. But they have business, you know, big shots. One thing I think the court should consider. Well, did they or didn't they? Do they have business experience on the executive level? I believe there was management presence of some sort on the first jury, to the extent that I can't recall the exact extent. Did they have a lawyer on the jury? No attorneys on the jury, I would remember that. Was it a six-person jury? It was an eight-person. Is that just to have two extra in case somebody gets off? That's typical practice there, an eight-person. But one thing for the court to bear in mind, there was some dispute even over the standard of review, which is fitting for this case, given the long-running disputes we've had in various courts now. And that is simply, it's abuse of discretion. So for the court to reverse, it would have to find that Judge Griesbach abused his discretion, a very broad discretion given a district court judge, in deciding whether a new trial is warranted when that district court judge. I don't see that. Where is that broad discretion? It's not in Rule 59. Well, this court's cases such as, again, McLean saying we must give every benefit of doubt to the trial judge. Why? And Mejia. We don't give every benefit of doubt to a trial judge. If we did, we'd never reverse. It's implicit, though, in the abuse of discretion standard, which this court. Abuse of discretion. What does abuse of discretion mean, anyway? It's when it's. It's just legal jargon. Doesn't mean anything. Well, I think it's formulated in some of the cases where there's no rational way in which a judge or no rational judge would make that. No, no, look, judges are constantly reversed, although they were rational. They're not irrational. They're not walking around in straight jackets because they're irrational. They're not the problem. If there's a mistake and the appellate court is confident there was a mistake, then it reverses. I don't think Howard could be particularly confident in a case like this. Well, Judge Griesbach was positioned there, observed the evidence, and he concluded that even under any theory that prime choice advanced, that would relate to reduction of damages, whether it be a theory of mitigation, a very novel theory of mitigation, that in order to mitigate, Schneider had to go back to prime choice. There was still, it's undisputed, the evidence showed prime choice was still working on a certain account for one major retailer, the largest account in that facility. And when they left, when they breached, repudiated the agreement at that time, Schneider had no choice but to find replacement. And getting to Judge Kaney's question earlier about communications, there were communications on August 27th. Schneider responded by a letter dated August 30th. It was August 31st that prime choice left. Prime choice's principal, President Mr. Huffman, instructed his subordinates not to communicate with Schneider. This is one of the many facts which the first jury considered in finding repudiation. That is an unequivocal expression of an intent not to perform, given the fact they didn't want to even talk to Schneider anymore at that point. Would this 30 days expire at this juncture? Your Honor, there's a five day cure period. And five day cure period began, the judge found as a matter of law, on August 30th, given the nature of the receipt of the correspondence, which had to be by a form of acknowledgment. That was by certified mail on August 30th, the court determined. So that meant the cure period would have lasted until September 4th, 2013. It was during that period of time that prime choice repudiated the agreement, resulting in, effectively, a total breach, and giving rise to Schneider's claim for damages. But it was also in the 10 days. Why was Schneider late in paying money to the prime? It is undisputed that the entire life of the agreement, Schneider never once paid within 30 days. The typical payment. Never once paid within 30 days for the entire life of the agreement. We never heard about that until August 27th, essentially. There may have been some earlier attempt at a call in August, but it was not anything that was of any cause of concern. You actually paid. You didn't pay by the time you usually pay, even though it was late. On the 27th, the evidence is that there was not a payment on that day, for whatever reason. But you've been paying about three days late, consistently. Correct, on average. There were other discrepancies. There were disputes about. It's a very complicated arrangement, but there were various disputes on invoices. But Schneider was paying. Schneider was performing. Prime choice didn't when it repudiated the agreement. And the only evidence at the first trial would lead one to believe there were some damages. There certainly were not zero. And that's why the district court found it was against the manifest weight of the evidence and granted the new trial. That was non-abusive discretion. OK, well, thank you very much, Mr. Smythes. Mr. Condon, do you have anything further? I think I have my time, ma'am. Well, if you want a minute or so, you can have it. When we're talking about Rule 59, and I would agree it doesn't get into what the actual factors are that the district court is supposed to review, I outlined the three that it was. Manifest weight of the evidence, shock to conscience. Those are also just words. But you have to be careful here in the court's decision when it says you can't have this because of the weight of the evidence. Look at all of the cases. They talk about manifest weight. They talk about all of these other things. What's the weight of the evidence? Are all of those cases you just referred to 59A cases? Yes, they are. So 59A, as usual, is a lot more than whatever 59A says. Lots of precedent. And the case to consider is Latino. That's the case that I've been relying upon for this case, as well as the facts. Which case? Latino versus Kaiser. Latino? L-A-T-I-N-O. Latino versus Kaiser. OK, thanks. Thank you. OK, thank you to both counsel. Next case for argument.